Filed 12/19/22; Modified and Certified for Pub.1/6/23 (order attached)

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| TRACY DOMINGUEZ et al.,<br><br>  Plaintiffs and Appellants,<br><br>  v.<br><br>ROB BONTA, as Attorney General etc., et al.,<br><br>  Defendants and Respondents. | F082053 & F082208<br><br>(Super. Ct. No. BVC-20-101229)<br><br>**OPINION** |

APPEALS from a judgment of the Superior Court of Kern County.  David R. Lampe, Judge.

Carpenter, Zuckerman & Rowley; Carpenter & Zuckerman, Robert J. Ounjian; and Nicholas C. Rowley for Plaintiffs and Appellants.

Rob Bonta, Attorney General, Thomas S. Patterson, Assistant Attorney General, Anthony R. Hakl and Jerry T. Yen, Deputy Attorneys General, for Defendant and Respondent Rob Bonta as Attorney General.

Vanessa L. Holton, Robert G. Retana and Sean T. Strauss for Defendant and Respondent Ruben Duran as Chairman of the Board of Trustees of the State Bar of California.

Tucker Ellis, Traci L. Shafroth and Aggie B. Lee for California Medical Association, California Dental Association, California Hospital Association and the American Medical Association as Amici Curiae on behalf of Defendants and Respondents.

Cole Pedroza, Kenneth R. Pedroza, Matthew S. Levinson and Cassidy C. Davenport for Anthony Allen, M.D., Bay Imaging Consultants Medical Group, Robert Binder, M.D., Cedars-Sinai Medical Center, Justin Davis, P.A., East Bay Neurospine, Kathryn Klima, M.D., Thomas J. Mampalam, M.D., Stuart Martin, M.D., Kathryn Sharma, M.D., Sutter Bay Hospitals, doing business as Alta Bates Summit Medical Center, Sara Vaughn, M.D., and Hans C. Yu, D.O., as Amici Curiae on behalf of Defendants and Respondents

-ooOoo-

Tracy Dominguez, Ruben Xavier DeLeon and Carpenter, Zuckerman & Rowley (CZR) (collectively, plaintiffs) appeal from a judgment of dismissal after the trial court sustained, without leave to amend, a demurrer brought by Rob Bonta as the Attorney General of the State of California (the Attorney General), and joined by Ruben Duran,[1] Chairman of the Board of Trustees of the State Bar of California (the Chairman) (collectively, demurring defendants).[2]

We affirm the judgment of dismissal.

---

[1]The lawsuit originally named Xavier Becerra in his capacity as the Attorney General of the State of California and Alan Steinbrecher in his capacity as Chairman of the Board of Trustees of the State Bar of California. We substitute the names of the current officeholders. (Cal. Style Manual (4th ed. 2000) § 6:19.)

[2]Plaintiffs filed two notices of appeal in connection with the matter. The first notice of appeal was filed on November 17, 2020 (case No. F082053) and the second notice of appeal was filed on December 21, 2020 (case No. F082208). Substantively, the notices of appeal are identical. On June 23, 2021, plaintiffs moved this court to consolidate the appeals. On July 28, 2021, this court granted the motion and designated case No. F082053 as the lead case.

2.

# FACTUAL AND PROCEDURAL BACKGROUND

On May 26, 2020, plaintiffs filed a complaint for declaratory and injunctive relief against the Attorney General, the Chairman, Mercy Hospital of Bakersfield (hospital), Arthur Park, M.D. (Dr. Park), and Hans C. Yu, D.O. (Dr. Yu).  (Hospital, Dr. Park, and Dr. Yu are referred to collectively as healthcare defendants.)  The facts and plaintiffs' contentions, as alleged in the complaint, follow.

## *Allegations in Appellant's Complaint*

Healthcare defendants are the defendants in a separate medical malpractice case (medical malpractice case) brought by plaintiffs Tracy Dominguez and Ruben Xavier DeLeon (heirs) in which healthcare defendants are alleged to have provided negligent medical care to Demi Ruben Dominguez and Malakhi Ruben DeLeon (collectively, decedents) resulting in decedents' deaths.[3]  Heirs are alleged to be the wrongful death heirs of decedents.  Heirs have suffered damages as a result of the alleged wrongful death of decedents, which "are primarily, if not entirely, noneconomic losses."  CZR is a law firm that "exclusively represents injury victims in tort matters on a contingency basis."  If successful on appeal of this matter, CZR seeks to represent heirs in the medical malpractice case.

In this action, plaintiffs challenge the constitutionality of two California statutes—Civil Code section 3333.2, which caps the amount of damages a plaintiff may recoup for noneconomic losses at $250,000 (Civ. Code, § 3333.2, subd. (b)); and Business and Professions Code section 6146, which sets limits on the amount of contingency fees a law firm may charge in representing a plaintiff in a professional negligence action against a health care provider.  (Civ. Code, § 3333.2 and Bus. & Prof. Code, § 6146 are sometimes referred to collectively as the challenged statutes.)

---

[3]*Dominguez v. Yu* (Super. Ct. Kern County, 2019, No. BCV-19-102255).

3.

Heirs "sought to retain the legal services of CZR to represent [them] in the medical malpractice action against [healthcare defendants]." However, CZR contends it is not economically feasible for it to represent heirs on a contingency basis given the limitations on recovery for noneconomic losses under Civil Code section 3333.2 and the limitations on contingency fee arrangements under Business and Professions Code section 6146. "CZR is ready, willing, and able to represent [heirs] if it is permitted to charge the contingency fee it ordinarily charges in personal injury matters and if the $250,000 cap on noneconomic damages is lifted."

Heirs desire to retain CZR but "cannot waive the statutory fee restrictions set forth above and CZR would be subject to discipline by the State Bar" if it accepted the engagement in violation of Business and Professions Code section 6146. The complaint alleges "the limitation on noneconomic damages … has deprived [heirs] of the ability to obtain legal redress for the medical negligence suffered to fully prosecute their action."

Plaintiffs allege Civil Code section 3333.2's cap on noneconomic damages was "enacted in 1975 and has not been adjusted—for inflation or otherwise—in the intervening nearly 45 years." Plaintiffs allege "CZR will spend at least $200,000 in costs to prosecute" heirs' claims against healthcare defendants; and because "the limit on contingent fees applies to [a] client's net recovery," CZR would only recover "a mere $20,000 in fees" on a maximum award of $250,000 for noneconomic damages.

Heirs "are currently paying their counsel an hourly rate to prosecute the underlying medical malpractice action." However, heirs "are of limited means and cannot afford to fully prosecute the action by paying their counsel on an hourly basis." Heirs "can only afford to be represented on a contingency fee basis."

Plaintiffs allege that whereas "medical malpractice plaintiffs … have caps imposed on their litigation expenditures," medical malpractice defendants (for various reasons) are incentivized to "incur costs approaching or even exceeding the $250,000 maximum judgment knowing that the plaintiffs will be forced to spend more than the

4.

plaintiffs can legally recover and will therefore be forced to abandon an otherwise meritorious action." Plaintiffs allege that medical malpractice plaintiffs "necessarily need to match the defendants' experts at least one-for-one at trial" and that "[b]y requiring the plaintiffs and [the] defendant to be on different financial footing, the [challenged statutes] require the plaintiff[s], at least in terms of expert witnesses, to only be able to bring a knife to the defendant's gunfight."

Plaintiffs further allege the concerns that led to passage of the challenged statutes (i.e., increasing insurance rates and fewer insurance companies willing to write medical malpractice insurance) are no longer of sufficient concern to justify the continued application of the statutes. They allege, among other things, that with the passage of Proposition 103 in 1988 insurance companies can "earn a reasonable return"; "premium increases have been moderate"; insurers "have been highly profitable"; there is a competitive medical malpractice insurance market; and "a large portion of payments made by insurance companies … are to insurance company defense attorneys and … defense costs." Plaintiffs allege "radically rising medical malpractice insurance rates … is not reasonably foreseeable."

In their complaint, plaintiffs assert various claims of unconstitutionality with regard to the challenged statutes. We discuss those claims in more detail in a subsequent part of this opinion.

***Relevant Procedural Background Following the Filing of the Complaint***

On August 25, 2020, the Attorney General demurred to plaintiffs' complaint and each cause of action therein on the grounds that plaintiffs "do not have standing to assert" any of the alleged causes of action, and each cause of action "fails to state facts sufficient to constitute a cause of action." On August 26, 2020, the Chairman joined in the Attorney General's notice of demurrer and demurrer.

On September 9, 2020, plaintiffs opposed the Attorney General's demurrer.

On September 14, 2020, plaintiffs filed a request that the complaint be dismissed with prejudice as to hospital only. The clerk of the court entered the dismissal as requested.

On September 15, 2020, the Attorney General filed his reply in support of his demurrer to plaintiffs' complaint.

On September 16, 2020, the Attorney General filed a notice of four related cases. According to the notice, CZR was handling three of the related cases and was making "identical arguments challenging the constitutionality of the [challenged statutes]."[4] The fourth related case, among other things, purportedly "[arose] from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law …."[5]

Also on September 16, 2020, plaintiffs filed a request that the complaint be dismissed without prejudice as to Dr. Park only. The clerk of the court entered the dismissal as requested.

On September 22, 2020, the demurrer came on regularly for hearing. All parties appeared through counsel. A tentative ruling was announced, the parties argued the matter, and the matter was deemed submitted.

On September 29, 2020, the trial court issued its ruling on the demurrer. It accepted the Chairman's joinder and sustained the demurrer, without leave to amend, finding that plaintiffs "are without standing to pursue the claims alleged and have failed to adequately allege[] facts to support the claims they purport to allege." The court indicated the complaint "does not state nor can it state a justiciable controversy as to [the] demurring Defendants." In its ruling, the trial court explained:

---

[4]*Luo v. Becerra* (Super. Ct. Alameda County, No. RG20057577); *Mosley v. Becerra* (Super. Ct. Los Angeles County, No. 20STCV12669); and *Johnson v. Becerra* (Super. Ct. Los Angeles County, No. 20STCV12766).

[5]*Miranda v. Becerra* (Super. Ct. Los Angeles County, No. 20STCV19825).

6.

"As to standing, none of the Plaintiffs alleges any injury conveying an ability to pursue their claims.  This is apparent on the face of the Complaint and Plaintiffs concede in their opposition that the injury at issue has not yet occurred, referring to it as an 'impending injury should the Court deny the declaratory relief sought.'  … Beyond this threshold problem, whether Civil Code section 3333.2 … and Business & Professions Code section 6146 are as flawed as Plaintiffs allege has been litigated and determined contrary to Plaintiffs' position on several occasions by the California Supreme Court.  Plaintiffs' Complaint seeks relief that is more appropriately sought before the Legislature."

The trial court further noted it was plaintiffs' burden to demonstrate how their complaint could be amended to correct any defects and that plaintiffs "fail[ed] to discuss how they can amend to overcome the demurrer."  The court directed the Attorney General to prepare an order conforming to the court's ruling.

On October 14, 2020, the trial court issued its order and judgment sustaining the Attorney General's demurrer without leave to amend and dismissing, with prejudice, the Attorney General and the Chairman from the action (judgment).

On November 17, 2020, notice of entry of the judgment was served and filed.  Also on November 17, 2020, plaintiffs filed a timely notice of appeal from the judgment.  On December 21, 2020, plaintiffs filed a substantively identical (and timely) notice of appeal from the judgment.  The appeals have been consolidated.  (See fn. 2, *ante*.)  Two amicus curiae briefs were filed in support of demurring defendants' position.[6]

---

[6]An amicus curiae brief was filed on behalf of the California Medical Association, the California Dental Association, the California Hospital Association, and the American Medical Association.  A separate amicus curiae brief was filed on behalf of Anthony Allen, M.D., Bay Imaging Consultants Medical Group, Robert Binder, M.D., Cedars-Sinai Medical Center, Justin Davis, P.A., East Bay Neurospine, Kathryn Klima, M.D., Thomas J. Mampalam, M.D., Kathryn Sharma, M.D., Sutter Bay Hospitals doing business as Alta Bates Summit Medical Center, Sara Vaughn, M.D., and healthcare defendant Dr. Yu.

**DISCUSSION**

## I.     Standard of Review

"'We review the ruling sustaining the demurrer de novo, exercising independent judgment as to whether the complaint states a cause of action as a matter of law.' [Citation.]  '"[W]e give the complaint a reasonable interpretation, reading it as a whole and its parts in their context."'  [Citation.]  'When conducting this independent review, appellate courts "treat the demurrer as admitting all material facts properly pleaded, but do not assume the truth of contentions, deductions or conclusions of law."'" (*Kahan v. City of Richmond* (2019) 35 Cal.App.5th 721, 730.)  Similarly, we "'may not consider conclusions of fact …, opinions, speculation or allegations which are contrary either to law or to judicially noticed facts'" (*Monterey Coastkeeper v. Central Coast Regional Water Quality Control Bd., etc.* (2022) 76 Cal.App.5th 1, 16.)  We also do not accept as true "'adjectival descriptions' … or 'unsupported speculation.'" (*Doe v. Roman Catholic Archbishop of Los Angeles* (2016) 247 Cal.App.4th 953, 960.)  We may, however, "consider matters subject to judicial notice …." (*Collins v. Thurmond* (2019) 41 Cal.App.5th 879, 891.)[7]

## II.     Plaintiffs' Contentions

Plaintiffs allege one or both of the challenged statutes, separately or in tandem, (1) impair heirs' "right to petition the government for redress of grievances" under the First

---

[7]Plaintiffs do not contend on appeal that the trial court's decision to deny them leave to amend was error.  Consequently, we do not consider whether plaintiffs could amend their complaint to state a valid cause of action. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 ["It is not [an appellate court's] place to construct theories or arguments to undermine the judgment and defeat the presumption of correctness"].)

Amendment[8] and Fourteenth Amendment[9] of the United States Constitution and article I, section 3 of the California Constitution;[10] (2) constitute "a government taking [of] private property without just compensation" in violation of the Fifth Amendment[11] and Fourteenth Amendment of the United States Constitution and article I, section 19 of the California Constitution;[12] (3) "violate the equal protection provisions" provided by the Fourteenth Amendment to the United States Constitution and article I, section 7[13] and article IV, section 16[14] of the California Constitution (as stated in two separate claims by plaintiffs); (4) "violate the due process provisions" (as stated in two separate claims by plaintiffs) and the "right to petition the government for redress of grievances" under the Fourteenth Amendment to the United States Constitution and article I, section 7,

[8]The First Amendment provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." (U.S. Const., Amend. I.)

[9]The Fourteenth Amendment provides, in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." (U.S. Const., Amend. XIV, § 1.)

[10]Article I, section 3 of the California Constitution provides, in part: "The people have the right to instruct their representatives, petition government for redress of grievances, and assemble freely to consult for the common good." (Cal. Const., art. I, § 3, subd. (a).)

[11]The Fifth Amendment provides, in relevant part: "No person shall be … deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." (U.S. Const., Amend. V.)

[12]Article I, section 19 of the California Constitution provides, in relevant part: "Private property may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner…." (Cal. Const., art. I, § 19, subd. (a).)

[13]Article I, section 7, subdivision (a) of the California Constitution provides, in relevant part: "A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws …." (Cal. Const., art. I, § 7, subd. (a).)

[14]Article IV, section 16 of the California Constitution provides, in relevant part: "All laws of a general nature have uniform operation." (Cal. Const., art. IV, § 16, subd. (a).)

9.

subdivision (a) of the California Constitution;[15]; and (5) deprive heirs of their "right to a jury trial as protected by" article I, section 16 of the California Constitution.[16] Based on the above allegations, plaintiffs seek a judicial declaration that "*Civil Code* § 3333.2's cap on noneconomic damages separately and, especially when coupled with *Business and Professions Code* § 6146's restriction on attorneys' fees, violate the U.S. and California Constitutions."

### III. Plaintiffs' Request for Judicial Notice

On August 19, 2021, plaintiffs requested this court take judicial notice of certain documents filed in the medical malpractice case, namely (1) heirs' notice of motion and motion to continue a hearing on a motion for summary judgment brought by Dr. Yu or, alternatively, to stay the medical malpractice case pending resolution of this appeal (stay motion), including a memorandum of points and authorities, and declarations from a CZR attorney and heirs' attorney in the medical malpractice case; (2) Dr. Yu's opposition to the stay motion; (3) heirs' reply brief in support of the stay motion including additional declarations from a CZR attorney, heirs' attorney in the medical malpractice case, and heirs; and (4) the order on the stay motion (collectively, medical malpractice filings). Plaintiffs also requested we take judicial notice of an "Accusation" filed before the Medical Board of California, Department of Consumer Affairs (Medical Board). (Unnecessary capitalization omitted.) We deferred ruling on plaintiffs' request pending consideration of the appeal on the merits.

Plaintiffs contend the medical malpractice filings are relevant to the appeal because they demonstrate the alleged inability of heirs to afford counsel to represent them

---

[15]Plaintiffs contend "the procedural component of the due process clause ensures a fair adjudicatory process before a person is deprived of life, liberty, or property," citing *Mullane v. Central Hanover Tr. Co.* (1950) 339 U.S. 306, 313.)

[16]Article I, section 16 of the California Constitution provides, in part: "Trial by jury is an inviolate right and shall be secured to all, but in a civil cause three-fourths of the jury may render a verdict…." (Cal. Const., art. I, § 16.)

in the medical malpractice case, and heirs "will lose a motion for summary judgment and be deprived of a determination on the merits." As for the "Accusation" before the Medical Board, plaintiffs contend it is relevant "to show [heirs] have a meritorious case and their inability to retain counsel is not due to the weakness of their case, but the restrictions of MICRA [Medical Injury Compensation Reform Act of 1975]."

"Courts can take judicial notice of the existence, content and authenticity of public records and other specified documents, *but do not take judicial notice of the truth of the factual matters asserted in those documents*." (*Glaski v. Bank of America* (2013) 218 Cal.App.4th 1079, 1090, italics added (*Glaski*).) Plaintiffs do not contend that the mere existence, content, or authenticity of the medical malpractice filings are relevant to their challenge of the trial court's disposition of demurring defendants' demurrer. Rather, they seek to have this court judicially notice the truth of averments made in the various declarations and other medical malpractice filings, including findings made by the trial court in the medical malpractice case. This we cannot do. (*Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1567–1568 [holding it improper to take judicial notice of the truth of a court's factual findings where principles of res judicata or collateral estoppel do not apply]; *Glaski*, at p. 1090.) Accordingly, we decline to take judicial notice of the medical malpractice filings.

As for the "Accusation" filed before the Medical Board, nothing in the Accusation suggests there has been a finding on the merits of heirs' case or any related allegation contained in the Accusation. The mere existence, content and authenticity of the Accusation does not enable this court to determine the truth of allegations therein. (*Glaski*, *supra*, 218 Cal.App.4th at p. 1090.) Accordingly, we decline plaintiffs' request to judicially notice this document.

Plaintiffs' request for judicial notice is denied.

11.

## IV.     The Medical Injury Compensation Reform Act (MICRA)

The challenged statutes (i.e., Civ. Code, § 3333.2 and Bus. & Prof. Code, § 6146) were enacted in 1975 as part of MICRA.  (*Roa v. Lodi Medical Group*, *Inc.* (1985) 37 Cal.3d 920, 923 (*Roa*).)

### A.     The Legislature's Rationale for Enacting MICRA

In enacting MICRA, "[t]he Legislature found that 'there is a major health care crisis in the State of California attributable to skyrocketing malpractice premium costs and resulting in a potential breakdown of the health delivery system, severe hardships for the medically indigent, a denial of access for the economically marginal, and depletion of physicians such as to substantially worsen the quality of health care available to citizens of this state.  The Legislature, acting within the scope of its police powers, finds the statutory remedy herein provided is intended to provide an adequate and reasonable remedy within the limits of what the foregoing public health and safety considerations permit now and into the foreseeable future.'"  (6 Witkin, Summary of Cal. Law (11th ed. 2017) Torts, § 1073, pp. 252–253, quoting Stats. 1975, 2d Ex. Sess., ch. 2, § 1, subd. (b).)

"In broad outline, the act (1) attempted to reduce the incidence and severity of medical malpractice injuries by strengthening governmental oversight of the education, licensing and discipline of physicians and health care providers, (2) sought to curtail unwarranted insurance premium increases by authorizing alternative insurance coverage programs and by establishing new procedures to review substantial rate increases, and (3) attempted to reduce the cost and increase the efficiency of medical malpractice litigation by revising a number of legal rules applicable to such litigation."  (*American Bank & Trust Co. v. Community Hospital* (1984) 36 Cal.3d 359, 363–364 (*American Bank*).)

"In the Legislature's view, '[t]he continuing availability of adequate medical care depends directly on the availability of adequate insurance coverage, which in turn operates as a function of costs associated with medical malpractice litigation.'  [Citation.] 'Accordingly, MICRA includes a variety of provisions all of which are calculated to

12.

reduce the cost of insurance by limiting the amount and timing of recovery in cases of professional negligence.'" (*Chan v. Curran* (2015) 237 Cal.App.4th 601, 607 (*Chan*).)

## B.     Civil Code Section 3333.2

"'[Civil Code s]ection 3333.2 constitutes a key component of [MICRA].'"  (*Chan*, *supra*, 237 Cal.App.4th at p. 608.)  It provides, in relevant part:  "(a) In any action for injury against a health care provider based on professional negligence, the injured plaintiff shall be entitled to recover noneconomic losses to compensate for pain, suffering, inconvenience, physical impairment, disfigurement and other nonpecuniary damage.  [¶] (b) In no action shall the amount of damages for noneconomic losses exceed two hundred fifty thousand dollars ($250,000)."  (Civ. Code, § 3333.2, subds. (a) & (b).)

Amici curiae correctly point out that "the Legislature has considered and rejected modifications to [Civil Code s]ection 3333.2 on a least three occasions"—in the late 1990's to increase the cap on noneconomic damages to $700,000.  (Assem. Bill No. 250 (1997–1998 Reg. Sess.)); two years later "to enact a bill that would have adjusted the limitation based on the Consumer Price Index."  (Assem. Bill No. 1380 (1999–2000 Reg. Sess.)); and, in 2014, "the Legislature declined to advance a bill meant to address the $250,000 limitation by stating an intent 'to bring interested parties together to develop a legislative solution to issues surrounding medical malpractice injury compensation.'" (Sen. Bill No. 1429 (2013–2014 Reg. Sess.)

Also, "[i]n the November 4, 2014, general election, California voters defeated Proposition 46, which, in part, would have modified MICRA's noneconomic damages limitation to reflect inflation, raising the cap to approximately $1.1 million as of January 1, 2015, and calling for annual adjustments thereafter."  (*Chan*, *supra*, 237 Cal.App.4th at p. 607, fn. 2.)

13.

## C. Business and Professions Code Section 6146

Business and Professions Code section 6146, the other challenged statute, provides, in relevant part: "(a) An attorney shall not contract for or collect a contingency fee for representing any person seeking damages in connection with an action for injury or damage against a health care provider based upon such person's alleged professional negligence in excess of the following limits: [¶] (1) Forty percent of the first fifty thousand dollars ($50,000) recovered. [¶] (2) Thirty-three and one-third percent of the next fifty thousand dollars ($50,000) recovered. [¶] (3) Twenty-five percent of the next five hundred thousand dollars ($500,000) recovered. [¶] (4) Fifteen percent of any amount on which the recovery exceeds six hundred thousand dollars ($600,000)." (Bus. & Prof. Code, § 6146, subd. (a).)

## D. Select Prior Decisions Addressing the Constitutionality of the Challenged Statutes and Other Statutes Enacted as Part of MICRA

### 1. California Supreme Court Case Law

#### a. American Bank

In one of the earliest MICRA-related cases decided by the California Supreme Court, *American Bank*, *supra*, 36 Cal.3d 359, the court considered a challenge to Code of Civil Procedure section 667.7, a provision in MICRA allowing an award of future damages to be paid in periodic installments rather than as a lump sum. (*American Bank*, at pp. 363–364.) The plaintiff challenged the constitutionality of the statute, arguing it "violate[d] the state and federal constitutional guarantees of due process, equal protection, and the right to jury trial." (*Id.* at p. 364.) The court rejected each of these challenges.[17] (*Id.* at pp. 368–370, 373–374, 377.)

---

[17]With regard to the jury trial right claim, the *American Bank* court acknowledged ambiguity in the statute could lead to constitutional infirmity but interpreted the statute in a manner that "avoid[ed] a potential conflict with the right to trial by jury." (*American Bank*, *supra*, 36 Cal.3d at p. 364; see *id.* at pp. 376–377.)

14.

With regard to the plaintiff's due process challenge, the *American Bank* court wrote: "It is well established that a plaintiff has no vested property right in a particular measure of damages, and that the Legislature possesses broad authority to modify the scope and nature of such damages." (*American Bank*, *supra*, 36 Cal.3d at p. 368.) "So long as the measure is rationally related to a legitimate state interest, policy determinations as to the need for, and desirability of, the enactment are for the Legislature." (*Id.* at 369.)

In rejecting the plaintiff's equal protection claims, the *American Bank* court referred to the medical malpractice insurance crisis that had arisen. (*American Bank*, *supra*, 36 Cal.3d at p. 371.) The court noted "a periodic payment of damages procedure could reasonably be applied across the entire tort spectrum," and, although the statute does treat medical malpractice defendants differently from other defendants, "the equal protection clause does not prohibit a Legislature from implementing a reform measure 'one step at a time' [citation], or prevent it 'from striking the evil where it is felt most.'" (*Ibid.*) The court also rejected the plaintiff's attempts to "challenge the factual accuracy" of the Legislature's rationale for enacting the provision. (*Id.* at pp. 371–372.) The court wrote: "It is not the judiciary's function … to reweigh the 'legislative facts' underlying a legislative enactment." (*Id.* at p. 372.) "Finally, and most fundamentally," the court wrote, "the constitutionality of a measure under the equal protection clause does not depend on a court's assessment of the empirical success or failure of the measure's provisions." (*Id.* at p. 374.) "'Whether *in fact* the Act will promote [the legislative objectives] is not the question: the Equal Protection Clause is satisfied by our conclusion that the [state] Legislature *could rationally have decided* that [it] … might [do so] ….'" (*Ibid*.) The court held "the provisions of [Code of Civil Procedure] section 667.7 are rationally related to [the Legislature's] objective" of "reduc[ing] insurance costs in the medical malpractice area." (*Id.* at p. 373.)

### b.    Barme

The same year *American Bank* was decided, our state high court decided *Barme v. Wood* (1984) 37 Cal.3d 174 (*Barme*), a case in which the court "face[d] a somewhat similar challenge to another provision of MICRA, Civil Code section 3333.1, subdivision (b) …." (*Id.* at p. 177.)  That provision provided "'*[n]o source of collateral benefits introduced pursuant to subdivision (a)*[18] shall recover any amount against the plaintiff nor *shall* it be *subrogated to the rights of a plaintiff against a defendant*.'" (*Id.* at p. 180.)

In *Barme*, a police officer "suffered a heart attack while on duty" and "sustained brain damage" allegedly due to the professional negligence of his health care providers. (*Barme*, *supra*, 37 Cal.3d at p. 177.)  The officer and his wife filed suit against the officer's health care providers. (*Ibid.*)  The City of Huntington Beach, desiring to recoup monies it expended "in providing workers' compensation benefits" to the officer pursuant to Labor Code section 3852, intervened in the action. (*Ibid.*)  Thereafter, the defendants successfully moved for summary judgment against the city on the ground that recovery was barred under Civil Code section 3333.1, subdivision (b). (*Barme*, at p. 178.)  The city appealed, contending said provision "violat[ed] its rights to both due process and equal protection." (*Id.* at p. 180.)  The California Supreme Court disagreed, holding the statute did not violate the city's due process rights because it was "rationally related to the objective of reducing the cost of medical malpractice insurance"—a legitimate public interest. (*Ibid.*)

---

**18**Subdivision (a) of Civil Code section 3333.1 provides:  "In the event the defendant so elects, in an action for personal injury against a health care provider based upon professional negligence, he may introduce evidence of any amount payable as a benefit to the plaintiff as a result of the personal injury pursuant to the United States Social Security Act, any state or federal income disability or worker's compensation act, any health, sickness or income-disability insurance, accident insurance that provides health benefits or income-disability coverage, and any contract or agreement of any group, organization, partnership, or corporation to provide, pay for, or reimburse the cost of medical, hospital, dental, or other health care services. Where the defendant elects to introduce such evidence, the plaintiff may introduce evidence of any amount which the plaintiff has paid or contributed to secure his right to any insurance benefits concerning which the defendant has introduced evidence."

The *Barme* court also rejected the city's equal protection argument—i.e., that the provision "afford[ed] medical malpractice defendants benefits not afforded to other tort defendants and impos[ed] a burden on employers who provide benefits to victims of medical malpractice that is not imposed on employers in other situations." (*Barme*, *supra*, 37 Cal.3d at pp. 181–182.) The high court noted it had rejected a similar argument in *American Bank*. (*Barme*, at p. 182.)

### c. Roa

The following year, 1985, *Roa* was decided. In *Roa*, the California Supreme Court considered a challenge to Business and Professions Code section 6146, also challenged here, on grounds the statute violated due process, equal protection, and the separation of powers. (*Roa*, *supra*, 37 Cal.3d at p. 925.) In considering the due process challenge, the court noted "the right to be represented by *retained* counsel in civil actions" is embraced by the due process guarantee. (*Ibid.*, italics added, citing *Powell v. Alabama* (1932) 287 U.S. 45, 68–69 and *Mendoza v. Small Claims Court* (1958) 49 Cal.2d 668, 673.) *Powell* clarified the proposition. Noting that due process entails notice and an opportunity to be heard, the *Powell* court wrote: "What, then, does a hearing include? Historically and in practice, in our own country at least, it has always included the right to the aid of counsel *when desired and provided by the party asserting the right*." (*Powell*, *supra*, at p. 68, italics added; accord, *Mendoza*, *supra*, at p. 673, citing *Powell*, at p. 68.) The *Roa* court determined Business and Professions Code section 6146 "does not in any way abrogate the right to retain counsel, but simply limits the compensation that an attorney may obtain when he represents an injured party under a contingency fee arrangement." (*Roa*, *supra*, at p. 926.)

The *Roa* court also noted that "[s]tatutory limits on attorney fees are not at all uncommon, either in California or throughout the country generally. In this state, attorney fees have long been legislatively regulated both in workers' compensation

17.

proceedings (Lab. Code, § 4906) and in probate matters. (Prob. Code, §§ 910, 901.) Some states have adopted maximum fee schedules which apply to *all* personal-injury contingency fee arrangements [citations]; others have enacted limits which, like [Business and Professions Code] section 6146, apply only in a specific area, such as medical malpractice. [Citations.] Congress has passed numerous statutes limiting the fees that an attorney may obtain in representing claimants in a variety of settings. (See, e.g., 28 U.S.C. § 2678 [limit on attorney fee in actions under the Federal Tort Claims Act]; 42 U.S.C. § 406(b)(1) [limit on attorney fee in actions under the Social Security Act]; 38 U.S.C. § 3404 [limit on fee for claims under the Veterans Benefit Act].)" (*Roa*, *supra*, 37 Cal.3d at p. 926.) The court further acknowledged "[t]he validity of such legislative regulation of attorney fees is well established." (*Ibid.*; see *id.* at pp. 926–927 [citing numerous U.S. Supreme Court cases and California case law].) The high court stated, "These decisions establish that … legislative ceilings on attorney fees are in no respect 'constitutionally suspect' or subject to 'strict' judicial scrutiny." (*Id.* at p. 927.)

In considering the equal protection challenge to Business and Professions Code section 6146, the *Roa* court gave a handful of examples of how the statute was rationally related to the objectives of MICRA. (*Roa*, *supra*, 37 Cal.3d at pp. 930–932.) The court also rejected the plaintiffs' separation of powers argument, which was premised on the contention the judiciary has "inherent power to review attorney fee contracts and to prevent overreaching and unfairness" and "the question of the appropriateness of attorney fees is a matter committed solely to the judicial branch." (*Id*. at p. 933.) Noting the historical legislative practice of "impos[ing] limits on attorney fees in a variety of fields," the court wrote, "Applicable California authority expressly refutes the claim that the Legislature has no power to act in this setting." (*Ibid*.)

### d. Fein

The same year *Roa* was decided, our state high court decided *Fein v. Permanente Medical Group* (1985) 38 Cal.3d 137 (*Fein*). In *Fein*, the plaintiff received a damages award of approximately $1 million, which included $500,000 for noneconomic damages. (*Id.* at pp. 142, 145.) At the defendant's request, the trial court modified the judgment by, among other things, reducing the award of noneconomic damages to $250,000 pursuant to Civil Code section 3333.2 (also at issue here). (*Fein*, at p. 145.) On appeal, the plaintiff argued the trial court erred in applying Civil Code sections 3333.2 and 3333.1. (*Fein*, *supra*, at p. 142.) The "plaintiff's argument track[ed] the constitutional objections to other provisions of MICRA that [the high court] ha[d] recently rejected in *American Bank*, *Barme* and *Roa*." (*Id.* at p. 157.)

In rejecting the plaintiff's due process argument, the *Fein* court noted the issue was somewhat different from that posed in *American Bank* in that the latter case involved the postponement of a plaintiff's receipt of damages by allowing periodic, rather than lump sum, payments. (*Fein*, *supra*, 38 Cal.3d at p. 158.) The court wrote, "That difference, however, does not alter the applicable due process standard of review. As our language in *American Bank* itself suggests, our past cases make clear that the Legislature retains broad control over *the measure*, as well as *the timing*, of damages that a defendant is obligated to pay and a plaintiff is entitled to receive, and that the Legislature may expand or limit recoverable damages so long as its action is rationally related to a legitimate state interest." (*Id.* at p. 158.) The court held that Civil Code section 3333.2 "is rationally related to the objective of reducing the costs of malpractice defendants and their insurers." (*Fein*, at p. 159; see *id.* at p. 160.)

The *Fein* court also rejected an equal protection challenge to Civil Code section 3333.2, premised on the dual argument "it impermissibly discriminates between medical malpractice victims and other tort victims, imposing its limits only in medical malpractice cases, and … improperly discriminates within the class of medical

19.

malpractice victims, denying a 'complete' recovery of damages only to those malpractice plaintiffs with noneconomic damages exceeding $250,000." (*Fein*, *supra*, 38 Cal.3d at pp. 161–162.) In rejecting the first argument, the court noted the Legislature was "responding to an insurance 'crisis' in that particular area and that the statute is rationally related to the legislative purpose" as stated in *American Bank*, *Barme*, and *Roa*. In rejecting the second argument, the court determined, among other things, that the equal protection clause "does not require the Legislature to limit a victim's recovery for out-of-pocket medical expenses or lost earnings simply because it has found it appropriate to place some limit on damages for pain and suffering and similar noneconomic losses." (*Fein*, at p. 162.) The court further noted that "Just as the complete elimination of a cause of action has never been viewed as invidiously discriminating within the class of victims who have lost the right to sue, the $250,000 limit—which applies to all malpractice victims—does not amount to an unconstitutional discrimination." (*Ibid.*) For these and other reasons we need not catalog, the court rejected the plaintiff's equal protection challenge. (*Id*. at pp. 162–163.)

### 2.  Other Case Law

#### a.  Stinnett

In 2011, this court decided *Stinnett v. Tam* (2011) 198 Cal.App.4th 1412 (*Stinnett*), which involved a constitutional challenge to Civil Code section 3333.2 on grounds the reduction of the plaintiff's jury award from $6 million to $250,000 "constituted (1) a violation of her right to equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution and by article I, section 7, subdivision (a) of the California Constitution and (2) a violation of [the plaintiff's] right to a jury trial under article I, section 16 of the California Constitution." (*Id.* at p. 1417.)

In support of her argument before the trial court, the *Stinnett* plaintiff proffered a declaration from an attorney "'heavily involved with the medical malpractice insurance

20.

industry'" who had "co-authored Proposition 103, the insurance reform initiative California voters enacted in 1988." (*Stinnett*, *supra*, 198 Cal.App.4th at p. 1419.) The gist of the attorney's declaration was similar to allegations made by plaintiffs herein. The attorney's declaration stated that, as of 2008, the circumstances that led to enactment of MICRA had changed such that "malpractice insurance rates were declining, dozens of traditional and nontraditional malpractice insurers were writing coverage, new carriers were entering the industry, claims payments were decreasing and malpractice insurance profits had been excessive for at least a decade; (2) while eliminating the MICRA cap on noneconomic damages would increase malpractice claims costs, 'eliminating the cap should not have a material effect on rates, since California malpractice insurers would still have been able to earn at least an adequate profit for the last ten years had the cap not existed, and would continue to be able to earn such a profit if the cap were eliminated today'; and (3) data from states that have not limited noneconomic damages indicate that malpractice insurers have been able to prosper in such states." (*Stinnett*, *supra*, at p. 1419.) The plaintiff likewise submitted an expert declaration indicating the "value of $250,000 in 1975" was reduced to "a present value in 2008 of approximately $58,857." (*Ibid*.)

We rejected the *Stinnett* plaintiff's equal protection challenge noting, among other things, that, in *Fein*, our state Supreme Court had already determined Civil Code section 3333.2 is "'rationally related to a legitimate state interest' and 'rationally related to the legislative purpose.'" (*Stinnett*, *supra*, 198 Cal.App.4th at p. 1432.)

We also rejected the *Stinnett* plaintiff's jury trial right challenge. (*Stinnett*, *supra*, 198 Cal.App.4th at p. 1433.) The *Stinnett* plaintiff contended the Legislature lacked authority to cap damages for noneconomic injury and that "only a jury" has such authority. (*Ibid.*) We concluded the plaintiff's argument went against our state Supreme Court's pronouncements that "'a plaintiff has no vested property right in a particular measure of damages, and … the Legislature possesses broad authority to modify the

21.

scope and nature of such damages' (*American Bank*, *supra*, 36 Cal.3d at p. 368)" and "'the Legislature retains broad control over *the measure*, as well as *the timing*, of damages that a defendant is obligated to pay and a plaintiff is entitled to receive, and … the Legislature may expand or limit recoverable damages so long as its action is rationally related to a legitimate state interest' (*Fein*, *supra*, 38 Cal.3d at p. 158)." (*Stinnett*, *supra*, 198 Cal.App.4th at p. 1433.) Noting we are bound by our high court's precedents, we likewise recognized a jury trial right challenge to Civil Code section 3333.2 was previously rejected in *Yates v. Pollock* (1987) 194 Cal.App.3d 195, 200, which relied on *Fein* and *American Bank* for its holding.

### b.    Chan

Several years after *Stinnett* was decided, and like *Stinnett* and the case before us, the First District Court of Appeal had occasion to consider the plaintiff's argument that, due to changed circumstances, the "noneconomic damages cap is no longer rationally defensible." (*Chan*, *supra*, 237 Cal.App.4th at p. 613.) The *Chan* plaintiff challenged Civil Code section 3333.2 on grounds it violated "equal protection, due process and the right to jury trial." (*Chan*, at p. 605.) The plaintiff contended she had "shown there no longer is a medical malpractice insurance 'crisis' and therefore the rationale for the cap (indeed, for all of MICRA) no longer exists." (*Id.* at p. 606.)

The *Chan* plaintiff introduced evidence (1) the $250,000 cap "in 2012 dollars equaled only $59,000 in 1975 dollars"; (2) the cost of legal services had risen "approximately sixfold" in the intervening period; (3) "the $250,000 noneconomic damages cap discourages contingent-fee lawyers from taking many malpractice cases"; (4) there has been "a precipitous increase in the cost of medical services and medical experts' hourly fees"; (5) that many personal injury lawyers "refuse to consider medical malpractice cases altogether, or take only those cases that appear strong and involve large economic damages" and that "according to these attorneys, cases involving severe injury

or death to the elderly and unemployed often do not reach the courts because economic damages are likely to be small, since lost wages are usually nonexistent and, if the victim is deceased, there are no future medical costs"; (6) that "insurance-industry lawyers can far outspend and outstaff cases because their clients pay by the hour and MICRA does not limit the amount of collectable fees"; (7) that the costs of trying the case on behalf of the plaintiff "far exceeded the jury award after the adjustment under MICRA …, let alone the maximum allowable contingency fee thereon"; and (8) with the passage of Proposition 103 in 1988, "medical malpractice insurance premiums rose an average of 14 percent per year, but since 1988, premiums have increased an average of only 1 percent per year" and that "California medical malpractice insurers are enjoying a period of high profits …." (*Chan*, *supra*, 237 Cal.App.4th at pp. 609–610.)

The *Chan* court noted the """"standard of rationality does not depend upon whether lawmakers ever actually articulated the purpose they sought to achieve. Nor must the underlying rationale be empirically substantiated. [Citation.] While the realities of the subject matter cannot be completely ignored [citation], a court may engage in "'rational speculation'" as to the justifications for the legislative choice [citation]. It is immaterial for rational basis review 'whether or not' any such speculation has 'a foundation in the record.'""" (*Chan*, *supra*, 237 Cal.App.4th at p. 612.)

"'While parties challenging legislation under the equal protection clause may introduce evidence supporting their claim that the legislation is irrational, they cannot prevail if it is evident that "'the question is at least debatable.'"' [Citations.] Thus, '[t]o mount a successful rational basis challenge, a party must "'negative every conceivable basis'" that might support the disputed statutory disparity. [Citations.] If a plausible basis exists for the disparity, courts may not second-guess its "'wisdom, fairness, or logic.'""" (*Chan*, *supra*, 237 Cal.App.4th at pp. 612–613.)

The *Chan* court further noted, "The role of 'changed circumstances' in constitutional analysis is fraught with institutional tension and analytical difficulties. 'It

23.

is not … easy for courts to step in and say that what was rational in the past has been made irrational by the passage of time, change of circumstances, or the availability of new knowledge.  Nor should it be.  Too many issues of line drawing make such judicial decisions hazardous.  Precisely at what point does a court say that what once made sense no longer has any rational basis?  What degree of legislative action, or of conscious inaction, is needed when that (uncertain) point is reached?  These difficulties—and many others—counsel restraint, and do so powerfully.'" (*Chan*, *supra*, 237 Cal.App.4th at pp. 613–614.)

"[C]ourts are extremely chary of invalidating legislative acts that have previously been held constitutional.  Our Supreme Court has done so only on rare occasions …." (*Chan*, *supra*, 237 Cal.App.4th at p. 606.)  *Chan* reiterated this court's observation that "'[g]enerally, modification or repeal of a statute made obsolete by virtue of changed conditions is a legislative, not a judicial, prerogative.'" (*Id.* at p. 614, citing, *Stinnett*, *supra*, 198 Cal.App.4th at p. 1428.)

The *Chan* court determined the plaintiff had "not shown there is no reasonably plausible purpose presently advanced by [Civil Code] section 3333.2." (*Chan*, *supra*, 237 Cal.App.4th at p. 606.)  The court concluded "*Fein* remains the controlling authority as to the constitutional validity of MICRA's noneconomic damages cap on equal protection grounds and reject[ed the plaintiff's] equal protection challenge to [Civil Code] section 3333.2." (*Chan*, *supra*, 237 Cal.App.4th at p. 621.)

*Chan* likewise rejected a similar due process argument as that made by plaintiffs—that the $250,000 cap on noneconomic damages "does not yield enough in contingency fees to make prosecuting most medical malpractice claims economically feasible, effectively denying most malpractice victims access to the courts." (*Chan*, *supra*, 237 Cal.App.4th at p. 623.)  The court noted this argument was "essentially the same due process argument that was advanced in *Roa* …," which "involved a challenge to

24.

MICRA's attorney fees provision limiting contingency percentages (Bus. & Prof. Code, § 6146), not to the act's damages provisions." (*Ibid.*, italics omitted.)

The *Chan* court noted the plaintiff's argument "is that noneconomic damages be potentially sufficient to cover attorney fees." (*Chan*, *supra*, 237 Cal.App.4th at p. 623.) The court described the plaintiff's position as "difficult to reconcile with the fact California ascribes to the 'American Rule' under which parties must bear their own attorney fees unless a statute or contract expressly provides for such." (*Id.* at pp. 623–624.) It also concluded it could not "reconcile [the plaintiff's] argument with the general rule that there 'is no due process right to counsel in civil cases.'" (*Id.* at p. 625.)

In rejecting the plaintiff's due process challenge, the *Chan* court concluded "MICRA's damages cap does not invariably close the courthouse doors to malpractice plaintiffs. Even assuming it diminishes the number of cases taken by lawyers on contingency, it does not prevent individuals from pursuing their own cases, hiring an attorney on an hourly basis, or seeking pro bono legal assistance. [Citations.] A malpractice victim may also negotiate a resolution of his or her claim, even if that may prove difficult." (*Chan*, *supra*, 237 Cal.App.4th at p. 627.)

Finally, *Chan* rejected the plaintiff's jury trial argument, which it characterized as a "variation" of the argument made in *American Bank* and noted "[t]he Supreme Court concluded that as long as the jury was the finder of fact as to the amount of future damages, the directive that the trial court fix the periodic payment schedule did not infringe on the right to jury trial." (*Chan*, *supra*, 237 Cal.App.4th at p. 628.) This holding, *Chan* noted, was reaffirmed in *Salgado v. County of Los Angeles* (1998) 19 Cal.4th 629, and that *Salgado* "[i]n discussing the noneconomic damages cap, … explained it 'places no limit on the amount of injury sustained by the plaintiff, as assessed by the trier [of] fact, but only on the amount of the defendant's liability.'" (*Chan*, at p. 629, quoting *Salgado*, at p. 640.) *Chan* described the plaintiff's jury trial right challenge as "'an indirect attack upon the Legislature's power to place a cap on damages'" and that

25.

"our Supreme Court has *repeatedly* held 'the Legislature retains broad control over the measure, as well as the timing, of damages that a defendant is obligated to pay and a plaintiff is entitled to receive ....'" (*Chan*, at p. 629.)

The foregoing authorities demonstrate that plaintiffs have chosen a daunting task in seeking to invalidate the challenged statutes. Their arguments on appeal raise some of the same or similar arguments as those raised in past challenges to MICRA's various provisions—albeit some with variations on those familiar themes.

Although sometimes couched in different ways, plaintiffs' lawsuit appears to challenge several principles set forth in prior California Supreme Court and Court of Appeal decisions, including, without limitation (1) whether a party has a "vested property right in a particular measure of damages" (*American Bank*, *supra*, 36 Cal.3d at p. 368 [holding no such right exists]); (2) whether the Legislature, as opposed to the judiciary should "reweigh the 'legislative facts' underlying a legislative enactment" (*id*. at p. 372 [concluding it should not]); (3) whether "legislative ceilings on attorney fees" are "'constitutionally suspect' or subject to 'strict' judicial scrutiny" (*Roa*, *supra*, 37 Cal.3d at p. 927 [answering both questions in the negative]); (4) whether capping noneconomic damages at $250,000 amounts to unconstitutional discrimination (see *Fein*, *supra*, 38 Cal.3d at p. 162 [holding it does not]) or violates a plaintiff's jury trial rights (see *Stinnett*, *supra*, 198 Cal.App.4th at p. 1433 [holding it does not]; *Yates v. Pollock*, *supra*, 194 Cal.App.3d at p. 200 [same]; *Chan*, *supra*, 237 Cal.App.4th at pp. 629–630 [same]); (5) whether a party has a right to counsel in civil proceedings (see *Chan*, at p. 625 [no due process right to counsel]); and (6) whether changed circumstances have rendered the challenged statutes unconstitutional because they are no longer rationally related to a legitimate state purpose (see *Stinnett*, *supra*, at pp. 1428–1432 [rejecting such a challenge]; *Chan*, *supra*, at pp. 621–622 [same]).

The trial court sustained demurring defendants' demurrer on both grounds asserted by demurring defendants to each cause of action, namely: (1) plaintiffs lack standing to

pursue the claims alleged in their complaint; and (2) plaintiffs failed to allege sufficient facts to constitute a cause of action. Because we conclude, *post*, that plaintiffs lack standing to pursue the claims they have alleged, we need not determine whether their allegations are sufficient to state one or more valid causes of action.

## V.     Plaintiffs Lack Standing to Challenge Civil Code Section 3333.2 and Business and Professions Code Section 6146

"Courts are created to resolve cases and controversies and not to render advisory opinions or resolve questions of purely academic interest. Accordingly, courts will not consider issues tendered by a person whose rights and interests are not affected." (*B. C. Cotton*, *Inc. v. Voss* (1995) 33 Cal.App.4th 929, 947–948.)

To have standing, "a party attacking the constitutionality of the statute must show some actual or threatened injury." (*Burns v. State Compensation Ins. Fund* (1968) 265 Cal.App.2d 98, 104.) "A person who invokes the judicial process lacks standing if he, or those whom he properly represents, 'does not have a real interest in the ultimate adjudication because [he] has neither suffered nor is about to suffer any injury of sufficient magnitude reasonably to assure that all of the relevant facts and issues will be adequately presented.'" (*Schmier v. Supreme Court* (2000) 78 Cal.App.4th 703, 707–708.)

"'To have standing, a party must be beneficially interested in the controversy; that is, he or she must have "some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large." [Citation.] The party must be able to demonstrate that he or she has some such beneficial interest that is *concrete and actual*, *and not conjectural or hypothetical*.'" (*Teal v. Superior Court* (2014) 60 Cal.4th 595, 599, original italics omitted, italics added.) This standard "is equivalent to the federal 'injury in fact' test …." (*Associated Builders & Contractors*, *Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 362.) ""Without standing, there is no actual or justiciable controversy, and courts will

27.

not entertain such cases."'" (*Schoshinski v. City of Los Angeles* (2017) 9 Cal.App.5th 780, 790.) "[A] difference of opinion as to [the] validity [of a statute] … is obviously not enough by itself to constitute an actual controversy." (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 173 (*Pacific Legal*).)

"A 'concrete' injury must be '*de facto*'; that is, it must actually exist. See Black's Law Dictionary 506 (10th ed. 2014). When we have used the adjective 'concrete,' we have meant to convey the usual meaning of the term—'real,' and not 'abstract.' Webster's Third New International Dictionary 472 (1971); Random House Dictionary of the English Language 305 (1967). Concreteness, therefore, is quite different from particularization." (*Spokeo*, *Inc. v. Robins* (2016) 578 U.S. 330, 340.) "The essence of the standing inquiry … is whether a dispute has matured to the point that it is proper for resolution by the judicial branch, i.e., whether 'the issues presented are "definite and concrete, not hypothetical or abstract." [Citation.] In assuring that this jurisdictional prerequisite is satisfied, we consider whether the plaintiffs face "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement," [citation,] or whether the alleged injury is too "imaginary" or "speculative" to support jurisdiction.'" (*Coral Construction*, *Inc. v. City and County of San Francisco* (2004) 116 Cal.App.4th 6, 25.)

The term "conjectural" is defined as "1: of the nature of or involving or based on conjecture …. [¶] 2: given to conjectures." (<https://www.merriam-webster.com/dictionary/conjectural> [as of Dec. 19, 2022].) The term "conjecture" in this context is defined as "1a: inference formed without proof or sufficient evidence [¶] b: a conclusion deduced by surmise or guesswork …. [¶] c: a proposition (as in mathematics) before it has been proved or disproved." (<https://www.merriam-webster.com/dictionary/conjecture#h1> [as of Dec. 19, 2022]; see <https:///www.dictionary.com> [as of Dec. 19, 2022], [defining the noun conjecture as

28.

"1 the formation or expression of an opinion or theory without sufficient evidence for [*sic*] proof [¶] 2 an opinion or theory so formed or expressed; guess; speculation"].)

## A.     CZR Does Not Have Standing

Plaintiffs make no argument concerning whether CZR has standing to pursue an attack, constitutional or otherwise, on the challenged statutes.  Nor are we able to discern a basis for CZR's standing in this matter.  "[A]n appellant's failure to discuss an issue in its opening brief forfeits the issue on appeal."  (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125.)  Accordingly, we affirm the judgment of dismissal as it pertains to CZR on grounds CZR lacks standing to pursue the claims alleged.

## B.     Heirs Do Not Have Standing

### 1.     *Heirs' Alleged Injuries Are Insufficient to Confer Upon Them Standing to Challenge the Statutes in Question*

In their opening brief, plaintiffs first address the standing issue by anticipating demurring defendants "will argue that [plaintiffs] lack standing because [heirs] retained [counsel] to represent them on an hourly fee per task basis" in the medical malpractice case.  In response to this anticipated argument, plaintiffs contend "the only evidence before this court is that [heirs' medical malpractice attorney] will no longer represent [heirs] and will withdraw.  As such, [heirs] are—for all practical purposes—in pro per."  Plaintiffs further contend the trial court made findings that heirs' "'financial situation leaves them in a position of being unable to present evidence in opposition to [Dr.] Yu's motion for summary judgment [in the medical malpractice case], even though such evidence exists in the form of contrary expert witness declarations'"; that their declaratory relief action at issue in the present case "'will determine whether [heirs] may retain the firm of [CZR] to litigate this matter under a contingency fee agreement that does not meet the confines of Business and Professions Code § 6146'"; and that without "controverting expert evidence," the summary judgment motion is "likely to be granted."

The above factual assertions are premised solely on statements contained in the medical malpractice filings that plaintiffs requested we judicially notice. As previously mentioned, we are unable to take judicial notice of the truth of those assertions. (*Glaski*, *supra*, 218 Cal.App.4th at p. 1090.)

Our review of the complaint reveals there are no allegations (1) that heirs' current medical malpractice attorney intends to withdraw from representing heirs in the medical malpractice case; (2) that heirs will be unable to present evidence in opposition to a pending motion for summary judgment in that matter; or (3) that evidence in opposition to the motion for summary judgment "exists in the form of contrary expert witness declarations." The only related allegation in the complaint appears to be that heirs "are of limited means and cannot afford to fully prosecute the action by paying their counsel on an hourly basis." Moreover, nothing in the complaint (or, for that matter, in the documents plaintiffs have requested we judicially notice) indicate heirs' current medical malpractice attorney has actually moved to withdraw from the litigation, or that the court has taken action on such a motion. To the contrary, the medical malpractice filings reveal that, at least as of the date of their filing, said attorney continues to represent heirs in the medical malpractice case. Although there is an averment of heirs' financial inability to pay *future* attorney costs, there is no averment that heirs have not paid fees and costs incurred as of the date of the medical malpractice filings.

Although the trial court in the medical malpractice case apparently opined (or found) that Dr. Yu's summary judgment motion would "likely be granted" in the absence of controverting expert evidence—which, as mentioned, we cannot assume to be true—we note the court did not state whether Dr. Yu had met his burden on summary judgment such that the burden would shift to heirs to present evidence sufficient to raise a triable issue of fact. Obviously, if Dr. Yu has not met his burden on summary judgment, the motion would properly be denied. Moreover, the court does not appear to have had the

30.

benefit of an opposition from heirs. We cannot presume the success or defeat of Dr. Yu's pending motion for summary judgment in the medical malpractice case.

Based on the allegations of the complaint, heirs have had access to the court system with respect to their medical malpractice claims and are currently represented in that action. "[W]hile MICRA's noneconomic damages cap may well influence an attorney's decision to take or reject a medical malpractice case on contingency, the cap does not violate a due process right to court access." (*Chan*, *supra*, 237 Cal.App.4th at p. 627.) "MICRA's damages cap does not invariably close the courthouse doors to malpractice plaintiffs." (*Ibid*.)

Moreover, even if we were to assume that heirs' medical malpractice attorney will withdraw from the litigation, heirs have no due process right to an attorney in the medical malpractice case. (*Chan*, *supra*, 237 Cal.App.4th at p. 625.) "[T]he general rule is that there is no due process right to counsel in civil cases. [Citation.] Generally speaking, the right to counsel has been recognized to exist only where the litigant may lose his physical liberty if he loses the litigation." (*Walker v. State Bar* (1989) 49 Cal.3d 1107, 1116, citing *Lassiter v. Department of Social Services* (1981) 452 U.S. 18, 25, and *Salas v. Cortez* (1979) 24 Cal.3d 22, 34.) As the *Chan* court aptly noted, "[e]ven assuming it diminishes the number of cases taken by lawyers on contingency, it does not prevent individuals from pursuing their own cases, hiring an attorney on an hourly basis, or seeking pro bono legal assistance." (*Chan*, *supra*, at p. 627.) The potential that heirs may ultimately have to prosecute their medical malpractice case in propria persona in the event their current medical malpractice counsel withdraws does not rise to the level of a cognizable injury for standing purposes in the case at bar.

The allegations of plaintiffs' complaint further establishes that heirs have yet to receive a final award or adjudication (favorable or unfavorable) in the medical malpractice case. At this stage of the medical malpractice litigation, to arrive at the conclusion that heirs have suffered or are about to suffer a concrete and actual injury to

31.

their interests, we would have to engage in rank speculation that heirs will ultimately prevail in that litigation—even though experience teaches us they may not prevail even with a meritorious case; that an assumed jury award in their favor will exceed the $250,000 noneconomic damages cap—even though any assumed award in their favor may actually prove to be less; that heirs could not obtain a similarly favorable award absent CZR undertaking their representation in the medical malpractice case—even though it is within the realm of possibility plaintiffs could secure a similar or more favorable award under alternative representation (e.g., pro bono representation, or self-representation),[19] and that the case would not settle before any assumed jury award was rendered—even though experience teaches us that is often the case.

Unlike *Stinnett* and *Chan*, where the plaintiffs in those cases actually obtained a favorable verdict in excess of the $250,000 noneconomic damages cap (*Stinnett*, *supra*, 198 Cal.App.4th at p. 1417 [$6 million noneconomic damage award reduced to $250,000]; *Chan*, *supra*, 237 Cal.App.4th at p. 605 [$1 million noneconomic damages award reduced to $250,000]), and thus could establish standing for purposes of their respective appeals, heirs have only an unrealized expectation of a favorable award in excess of MICRA's noneconomic damages cap that may, or may not, ever come into fruition. It is not within our province to speculate as to the outcome of heirs' medical malpractice case and we express no opinion in that regard. At this stage of the medical malpractice case, however, heirs' alleged injuries are neither concrete nor actual. They are, at present, conjectural and hypothetical.

---

[19]Although we recognize, as a practical matter, it is often more difficult for a self-represented plaintiff to present his or her case to a trier of fact, we cannot assume or presume plaintiffs would be unable to do so effectively.

### 2. The Trial Court Did Not Err in Deciding Plaintiffs' Declaratory Relief Cause of Action on Demurrer

Plaintiffs contend they have alleged an actual controversy, it was improper for the trial court to decide plaintiffs' declaratory relief cause of action on demurrer, and they "were entitled to an opportunity to conduct discovery and present their case." In essence, plaintiffs contend they have alleged sufficient facts demonstrating "a constitutionally significant change in circumstances" to warrant a trial of the matter.

Amici curiae note plaintiffs allege that heirs "have a property right in the non-economic damages owed" to them by healthcare defendants and that the right is assignable. However, amici argue that assignability does not equate with a vested property right and that California Supreme Court authority confirms there is "no property right to a particular measure of damages." Amici further note the case is not ripe for adjudication because there has been no jury verdict in excess of $250,000, the dispute is not sufficiently concrete, and heirs have not and cannot show they "'will suffer hardship if judicial consideration is withheld.'" Amici further argue the challenge to Business and Professions Code section 6146 requires this court "to speculate that [heirs] will not be able to achieve through the underlying action what [CZR] could have achieved had it accepted the case" and that this court is being "'asked to speculate on the resolution of hypothetical situations' of what could potentially result in that litigation." Amici contend, "[w]ithout the application of MICRA's provisions to an existing jury verdict, there is no 'hardship to the parties of withholding court consideration,' 'as the difference of opinion regarding the [statutes'] validity [is] not enough by itself to constitute an actual controversy,'" citing *Pacific Legal*, *supra*, 33 Cal.3d at pages 172–173.

Code of Civil Procedure section 1060 provides, in part:

> "Any person interested under a written instrument, excluding a will or a trust, or under a contract, or who desires a declaration of his or her rights or duties with respect to another, or in respect to, in, over or upon property, or with respect to the location of the natural channel of a watercourse, may, *in cases of actual controversy* relating to the legal rights and duties of the

33.

respective parties, bring an original action or cross-complaint in the superior court for a declaration of his or her rights and duties in the premises, including a determination of any question of construction or validity arising under the instrument or contract…." (Italics added.)

Plaintiffs' cause of action for declaratory relief is derivative of plaintiffs' other claims. Their declaratory relief cause of action incorporates all prior allegations contained in the complaint and then alleges "[a]n actual and justiciable controversy exists between Plaintiffs and Defendants because Plaintiffs contend, and Defendants dispute, that Defendants' actions, inactions, and intended actions as described above have and will violate the constitutional provisions cited herein" and "Plaintiffs seek a declaration that *Civil Code* § 3333.2's cap on noneconomic damages separately and, especially when coupled with *Business and Professions Code* § 6146's restrictions on attorneys' fees, violate the U.S. and California Constitutions." No additional facts are alleged in this cause of action.

"'The "actual controversy" language in Code of Civil Procedure section 1060 encompasses a *probable* future controversy relating to the legal rights and duties of the parties. [Citation.]' [Citation.] It does not embrace controversies that are 'conjectural, anticipated to occur in the future, or an attempt to obtain an advisory opinion from the court.' [Citation.] Thus, while a party may seek declaratory judgment before an actual invasion of rights has occurred, it must still demonstrate that the controversy is justiciable. [Citation.] And to be justiciable, the controversy must be ripe." (*Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1582.) "'To determine whether an issue is ripe for review, we evaluate two questions: the fitness of the issue for judicial decision and the hardship that may result from withholding court consideration.'" (*Ibid.*) The two-pronged test for ripeness has also been described as follows: "(1) whether the dispute is sufficiently concrete so that declaratory relief is appropriate; and (2) whether the parties will suffer hardship if judicial consideration is withheld." (*City of Santa Monica v. Stewart* (2005) 126 Cal.App.4th 43, 64.)

34.

Plaintiffs' argument that it was improper for the trial court to sustain the demurrer as to plaintiffs' declaratory relief cause of action is premised on their contention they have articulated an actual controversy—i.e., a controversy that is ripe for adjudication under the tests described above.

We have already explained our determination that plaintiffs' alleged injuries are neither concrete nor actual, and that they are, at the present time, conjectural and hypothetical. For the same reasons supporting that determination, we cannot conclude plaintiffs will suffer hardship if declaratory relief is withheld. We would have to engage in all manner of speculation to arrive at such a conclusion. At present, plaintiffs and demurring defendants merely have "a difference of opinion as to [the] validity [of the challenged statutes,]" which our high court has stated, "is obviously not enough by itself to constitute an actual controversy." (*Pacific Legal*, *supra*, 33 Cal.3d at p. 173.)

Notably, none of the authorities cited by plaintiffs stand for the proposition that an appellant may avoid a demurrer merely by alleging an unripe dispute constitutes an "actual controversy." (See *Ludgate Ins. Co. v. Lockheed Martin Corp.* (2000) 82 Cal.App.4th 592, 604–605 [each party, through their pleadings, admitted facts demonstrating an actual controversy]; *Wellenkamp v. Bank of America* (1978) 21 Cal.3d 943, 947 ["It is clear that the complaint shows the existence of an actual controversy sufficient to state a cause of action for declaratory relief"], superseded by statute and regulation on unrelated grounds in *Fidelity Federal Sav. & Loan Assn. v. de la Cuesta* (1982) 458 U.S. 141, 170, fn. 24.)

Even plaintiffs' cited authority of *Alfaro v. Terhune* (2002) 98 Cal.App.4th 492 held that the trial court did not err in sustaining a demurrer to the plaintiffs' constitutional claim (asserted in a declaratory relief cause of action) where the claim was capable of being resolved as a question of law. (*Id.* at pp. 498, 509–510; see *Coffman Specialties, Inc. v. Department of Transportation* (2009) 176 Cal.App.4th 1135, 1144, 1155 [demurrer sustained as to declaratory relief cause of action alleging statute's

35.

unconstitutionality upheld on appeal]; *Monsanto Co. v. Office of Environmental Health Hazard Assessment* (2018) 22 Cal.App.5th 534, 550–551 [judgment on pleadings and demurrer sustained as to declaratory relief cause of action alleging unconstitutionality of statute upheld on appeal].)

"A demurrer raises only a question of law, as the allegations of fact contained in the complaint must be accepted as true by the court for purposes of review." (*Cellular Plus*, *Inc. v. Superior Court* (1993) 14 Cal.App.4th 1224, 1231.) We have reviewed the allegations of the complaint and conclude, as a matter of law, that plaintiffs have not alleged an actual controversy for purposes of Code of Civil Procedure section 1060.

We conclude plaintiffs lack standing to challenge Civil Code section 3333.2 and Business and Professions Code section 6146.

## DISPOSITION

The judgment of dismissal is affirmed. Demurring defendants the Attorney General and the Chairman are entitled to their costs on appeal.

PEÑA, J.

WE CONCUR:


HILL, P. J.


SNAUFFER, J.

36.

Filed 1/6/23

<u>**CERTIFIED FOR PUBLICATION**</u>

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| TRACY DOMINGUEZ et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> ROB BONTA, as Attorney General etc., et al., <br><br> Defendants and Respondents. | F082053 & F082208 <br><br> (Super. Ct. No. BVC-20-101229) <br><br> **ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PUBLICATION** <br> [NO CHANGE IN JUDGMENT] |

**THE COURT:**

It is ordered that the opinion filed herein on December 19, 2022, be modified as follows:

At the end of the third paragraph on page 3, add as footnote 4 the following footnote, which will require renumbering of all subsequent footnotes:

[4]In 2022, the Legislature enacted Assembly Bill No. 35 (2021–2022 Reg. Sess.), which amends Civil Code section 3333.2, Business and Professions Code section 6146, and other related statutes. However, the newly enacted legislation is not at issue in this appeal. Effective January 1, 2023, Civil Code section 3333.2, among other things, increases the dollar amount limitation of damages awards for noneconomic losses in medical malpractice cases (1) to $350,000 for injury not involving wrongful death, with specified annual increases to this dollar amount limitation until it reaches $750,000; and (2) to $500,000 for injuries involving wrongful death, with specified annual increases to this dollar amount limitation until it reaches $1 million. (Stats. 2022, ch. 17, § 3.) In addition, the new law establishes three separate categories of health care defendants against whom a plaintiff may seek damages. (*Ibid*.) Effective January 1, 2023, Business and Professions Code section 6146, among other things,

restructures the contingency fee percentages an attorney may charge a plaintiff in a medical malpractice action, and authorizes different contingency fee percentages depending on the stage of litigation in which recovery is obtained.  (Stats. 2022, ch. 17, § 2.)

There is no change in the judgment.  Except for the modification set forth, the opinion previously filed remains unchanged.

The opinion in the above-entitled matter filed on December 19, 2022, was not certified for publication in the Official Reports.  For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

PEÑA, J.

WE CONCUR:

HILL, P. J.

SNAUFFER, J.

2.